IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HERB A. PASKEWITZ, | ) | CASE NO. 1:11CV2371 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN A. POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Herb A. Paskewitz ("Plaintiff" or "Paskewitz") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 416(i) and 423, and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 *et seq.*  Doc. 1.  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).  For the following reasons, the final decision of the Commissioner should be **AFFIRMED.**

## I.  Procedural History

On January 30, 2009, Paskewitz filed applications for SSI and DIB, alleging a disability onset date of December 14, 2008.  Tr. 107-16, 125.  Paskewitz claimed that he was disabled due to a combination of impairments, including bipolar disorder, severe burns on both of his hands, major depression, and psychosis.  Tr. 85-87, 88-90.  The state agency denied Paskewitz's claims initially and upon reconsideration, and Paskewitz timely requested a hearing before an administrative law judge.  Tr. 73-74, 85-90, 93-89.  On December 17, 2010, a hearing was held before Administrative Law Judge Whitfield Haigler, Jr. (the "ALJ").  Tr. 459-81.  On March 11,

1

2011, the ALJ issued a decision finding that Paskewitz was not disabled.  Tr. 8-18.  Paskewitz

requested review of the ALJ's decision by the Appeals Council on May 6, 2011.  Tr. 7.  On

September 7, 2011, the Appeals Council denied review, making the ALJ's decision the final

decision of the Commissioner.  Tr. 1-6.

## II.  Evidence

### A.    Background

Paskewitz was born on April 9, 1957, and was 53 at the time of the administrative

hearing.  Tr. 107.  He graduated from high school.  Tr. 466.  At the time of the hearing, he lived

in a house with his wife and three adult children.  Tr. 465.

### B.    Medical Evidence

#### 1.    Treatment for Hand Injury

Paskewitz alleges disability as of December 14, 2008, after he attempted to commit

suicide by grabbing an electrical outlet/panel.  Tr. 125.  Paskewitz received third-degree burns to

his dominant right hand as a result of the electrical shock and was hospitalized at MetroHealth

System ("MetroHealth") for one month due to his injuries.  Tr. 202-05, 213-19.  Between

December 2008 and February 2009, Paskewitz had three surgeries on his hand and also began

occupational therapy.  Tr. 183-88, 190-95.  At the start of his occupational therapy sessions,

Paskewitz was generally observed to have edema and range of motion limitations in his right

hand, which he was unable to use for any activity.  Tr. 184, 187, 191, 194.  By the end of

February 2009, however, Paskewitz had improved range of motion and was using his right hand

to feed himself and perform some of his activities of daily living.  Tr. 184, 346.

At an occupational therapy session on March 5, 2009, it was noted that Paskewitz had

moderate edema in his right hand, and while he did not have a composite fist, he was progressing

2

towards it. Tr. 343-44. At a therapy session on March 26, 2009, Paskewitz stated that his hand was better since starting wound care two times a day. Tr. 337. He also described his pain level as 0 out of 10 at rest and 3-4 out of 10 with stretching into end ranges. Tr. 337.

On April 9, 2009, Daniel A. Medalie, M.D., the treating surgeon who performed the operations on Paskewitz's hand, examined Paskewitz and noted that his hand, fingers, and wrist were swollen and limited in range of motion. Tr. 334. Dr. Medalie also found that Paskewitz had complete anesthesia of his thumb and hypoesthesia of his index finger. Tr. 334.

At the next occupational therapy session on April 14, 2009, Paskewitz was able to hold some light tools in his right hand. Tr. 330-31. He was also able to feed himself with his right hand, often without adapted foam handles, write for a short time, and was improving with don/doff of shirts, pants, and coats with right shoulder range of motion gains. Tr. 330-31. The therapist noted that, functionally, Paskewitz continued to improve and had incorporated his right upper extremity into more daily activities with less assistance from his wife. Tr. 331.

On April 15, 2009, Maria Congbalay, M.D., a state agency consultant, reviewed Paskewitz's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. Tr. 260-67. She opined that Paskewitz could perform light work; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; and must avoid all exposure to hazards. Tr. 265. Dr. Congbalay noted that Paskewitz's right hand was healing, that he was undergoing aggressive occupational therapy, and that the limitations from the injury to his right hand were not expected to last for a period of twelve consecutive months. Tr. 265.

Paskewitz saw Dr. Medalie on April 30, 2009. Tr. 321. Dr. Medalie noted that Paskewitz's right hand, fingers, and wrist were swollen and limited in range of motion. Tr. 321. He also observed that Paskewitz's fifth finger was unable to extend and had a flex lag, and that

there was hypoesthesia of the right thumb.  Tr. 321.  He recommended that Paskewitz continue with occupational therapy to improve range of motion.  Tr. 321.

At an occupational therapy session on May 12, 2009, the therapist noted increased clawing in the small right finger but also found that Paskewitz met several goals for use of his right hand.  Tr. 309.  The first goal was to demonstrate functional dexterity in his right hand to pick up coins and handle tools.  Tr. 309.  The therapist noted that this goal was "achieved 4/28 for light objects (picks up small electric hand drill, able to pick up coins with some effort.)."  Tr. 309.  The second goal was functional composite fisting of the right hand to allow for grasp on tools, wash cloth, and steering wheel.  Tr. 309.  The therapist noted that this goal "achieved 4/28 for large handled tools, wringing washcloth tightly difficult, holds on to steering wheel but limited ulnar grasp."  Tr. 309.  At a session on May 22, 2009, the therapist stated that Paskewitz had improved range of motion in some areas and limited right-hand strength.  Tr. 304-05.

In a treatment note from occupational therapy on June 5, 2009, the therapist found that Paskewitz had attained functional use of his right upper extremity and that he was using it more spontaneously.  Tr. 282.  The therapist also noted that Paskewitz was dressing himself, eating with his right upper extremity, and performing some light household activities.  Tr. 282.  The therapist discharged Paskewitz from occupational therapy because he had achieved all of the goals for occupational therapy for his right hand.  Tr. 282-83.

On August 13, 2009, Elizabeth Das, M.D., a state agency consultant, completed a case analysis with regard to Paskewitz's physical impairments.  Tr. 354.  She opined that Paskewitz's electrical burn was not expected to last for 12 months and that Dr. Congbalay's initial RFC assessment from was affirmed.  Tr. 354.

4

On August 13, 2009, Paskewitz saw Dr. Medalie for a follow-up visit.  Tr. 401-02.  Dr. Medalie noted that Paskewitz's "wounds are healed and he has made significant improvements in [range of motion] and strength."  Tr. 401.  He also noted that Paskewitz was able to flex his right hand into a fist with good grip strength, except that there was a slight limitation of his small finger.  Tr. 401.  Dr. Medalie observed stiffness and extensor lag in Paskewitz's ring and small fingers and good range of motion in Paskewitz's thumb, except limited adduction.  Tr. 401.  Dr. Medalie stated that Paskewitz had no sensation in his palmar thumb and the radial side of his index finger, but normal sensation otherwise.  Tr. 401-02.  Dr. Medalie's assessment was that Paskewitz had "good return of most function."  Tr. 401.

Paskewitz did not see Dr. Medalie again until July 8, 2010.  Tr. 412.  Dr. Medalie noted that, when he last saw Paskewitz almost a year prior, Paskewitz had extensor lag and tendon rupture and was very stiff.  Tr. 412.  On examination that day, however, Dr. Medalie found that, while Paskewitz had some elements of swan neck[1] in his middle and ring fingers and moderate 5th extensor lag, he had good range of motion, could make a fist, and could extend all of his fingers except for his ring finger.  Tr. 412.  Dr. Medalie referred Paskewitz for a second opinion regarding whether additional surgery on Paskewitz's right hand would be beneficial.  Tr. 412.

On October 20, 2010, Paskewitz obtained a second opinion from Michael W. Keith, M.D. Tr. 454-55.  On examination, Dr. Keith noted that Paskewitz had intermittent pain and numbness to his thumb tip, that he was unable to extend his 5th finger, and that he had locking of his middle and ring fingers.  Tr. 454.  Paskewitz was able to oppose his thumb to all fingers.  Tr. 454.  Dr. Keith noted that Paskewitz also had swan neck deformities of fingers 3 and 4 and a

---

[1]  With a swan neck deformity, "there is fixed hyperextension of the proximal interphalangeal ("PIP") joint and accompanying flexion of the distal interphalangeal ("DIP") joint." TUREK'S ORTHOPAEDICS: PRINCIPLES AND THEIR APPLICATION 165 (Stuart L. Weinstein, M.D. & Joseph A. Buckwalter, M.D., eds., 5th ed. 1994) ("TUREK'S").  The result of this condition is that the finger resembles the neck and head of a swan. *See id.*

boutonniere deformity[2] on his 5th finger.  Tr. 454.  Dr. Keith recommended that Paskewitz use counterbalancing splints for three months.  Tr.454.  Dr. Keith also stated that Paskewitz's "hands have recovered very well. Dr. Medalie and his team have restored the usefulness of his right hand and he is back at work."  Tr. 454.

### 2.    Mental Health Treatment

After his suicide attempt, Paskewitz received inpatient psychiatric care at MetroHealth from December 29, 2008 until January 12, 2009.  Tr. 213-16.  He was diagnosed with bipolar disorder, not otherwise specified.  Tr. 213.  On discharge, his condition was stable, but depressed, and his GAF score was 61-70.[3]  Tr. 214-15.  He was seen again on January 13, 2009, at which time his mental status examination was unremarkable, with the exception of an anxious mood.  Tr. 206-08.  His GAF score was 51-60.  Tr. 208.

Paskewitz began treatment at the Far West Center on February 11, 2009.  Tr. 236-39.  He reported feeling 80% improved and denying any suicidal thoughts.  Tr. 236-39.  The mental status examination was unremarkable, and his GAF score was 50.  Tr. 238-39.  Between March and August 2009, Paskewitz attended three more sessions at the Far West Center.  Tr. 240-41, 270-73, 357-58.  Mental status examinations were generally unremarkable and Paskewitz reported no suicidal ideations at any of these sessions.  Tr., 240-41, 271-72, 357-58.  At the

---

[2]  With a boutonniere deformity, "there is a flexion contracture of the PIP joint in association with hyperextension of the DIP joint." TUREK'S 165.

[3] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.* A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

6

session on March 25, 2009, Paskewitz denied feeling significantly depressed and reported good concentration.  Tr. 240.  He was diagnosed with bipolar disorder.  Tr. 241.  At the session on May 19, 2009, he denied any significant mood or anxiety symptoms, and reported good memory and concentration.  Tr. 270.  The counselor noted that Paskewitz's bipolar disorder was in remission.  Tr. 271.  At the session on August 4, 2009, he denied any depressive or manic symptoms.  Tr. 357.  The counselor again noted that Paskewitz's mental impairment was in remission.  Tr. 358.

On April 10, 2009, a state agency consultant, John Waddell, Ph.D., reviewed the medical evidence and completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment.  Tr. 242-55, 256-59.  Dr. Waddell opined that Paskewitz had moderate restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  Tr. 252.  Dr. Waddell opined that Paskewitz, despite his mental impairments, was "able to understand, remember, and complete a variety of tasks in environments [without] time or production pressure. He can engage appropriately in social interactions."  Tr. 256-59.  On July 14, 2009, Roy Shapiro, Ph.D., a state agency consultant, reviewed the medical evidence and affirmed the assessment of Dr. Waddell as written.  Tr. 353.

On September 9, 2009, Paskewitz reported to MetroHealth System for a referral to a psychiatrist for his depression.  388-401.  On examination, it was noted that Paskewitz had a mildly flat affect.  Tr. 400.  Paskewitz was given a referral to a MetroHealth psychiatrist and was advised to continue on his current medications.  Tr. 400.

Paskewitz was seen again at the Far West Center on September 15, 2009.  At this session, he reported no acute symptoms, but noted irritability, worrying, and poor sleep.  Tr. 355.  The

7

counselor noted that Paskewitz was calm and less depressed, that he had a mobile affect, that his speech was fairly productive and coherent, that he had tight associations, that he had no psychosis or suicidal or homicidal ideation, and that he was preoccupied with financial stress. Tr. 355.  The counselor also noted that his mental impairment was still in remission.  Tr. 356.

Paskewitz transferred his mental health care from Far West Center to MetroHealth and began seeing Olufunke O. Fajobi, M.D., on February 8, 2010.  Tr. 369-75.  Dr. Fajobi noted that mental status examination findings were unremarkable.  Tr. 374.  He also noted that Paskewitz was on three mood stabilizers, "with [obvious] tremors and masked facies, and stiff posture."  Tr. 375.  Dr. Fajobi diagnosed Paskewitz with history of bipolar disorder, not otherwise specified, and noted a GAF score of 61-70.  Tr. 375.

Paskewitz saw Dr. Fajobi again on April 16, 2010.  Tr. 364.  Paskewitz reported that he was sleeping 16 hours a day and that he had a lack of interest in anything.  Tr. 364.  However, he stated that he did not feel depressed.  Tr. 364.  Paskewitz also reported poor motivation but denied having a sad mood.  Tr. 364.  Dr. Fajobi observed that Paskewitz's mood was depressed and his affect was blunt but otherwise found nothing remarkable in the objective/mental status examination section.  Tr. 364.

On May 14, 2010, Plaintiff saw Dr. Fajobi and reported that he was staying awake during the day and sleeping less.  Tr. 359.  He also denied any current depressive symptoms.  Tr. 359. Paskewitz also stated that he had more energy and was working in the yard.  Tr. 359.  Dr. Fajobi noted that Paskewitz's mood was "ok" and his affect was blunt; all other findings were unremarkable.  Tr. 359-60.

Paskewitz saw Dr. Fajobi again on September 1, 2010.  At this visit, he reported no new concerns and he denied any current depressive symptoms or anger outbursts or suicidal ideation.

Tr. 426.  Paskewitz stated that he was doing more at home and was more motivated.  Tr. 426.

Dr. Fajobi observed that Paskewitz was adequately groomed, cooperative, and oriented to time,

person, and place.  Tr. 427.  Dr. Fajobi also noted that Paskewitz's speech was spontaneous and

at a normal rate, that his thought process was logical and organized, that there was no evidence

of paranoia or delusions, that he had no suicidal or homicidal ideations, that there was no

evidence of perceptual disturbance, that his mood was "ok," that his affect was blunt, that his

attention and concentration were sustained, that his recent and remote memory were within

normal limits, and that his judgment and insight were fair.  Tr. 427.  Dr. Fajobi stated that there

was improvement in Paskewitz's depression and anger.  Tr. 427-28.  Dr. Fajobi also noted that

the problems being treated are amenable to intervention.  Tr. 428.

## C.    Non-Medical Evidence

On December 15, 2010, the owner of AM Industrial, the company where Paskewitz

worked, wrote a letter to Paskewitz's attorney and explained that Paskewitz did "odd jobs,"

earned a minimal salary, and set his own schedule.  Tr. 173.  He stated that he did not give

Paskewitz any time-sensitive tasks, that Paskewitz's physical dexterity was substantially limited

to a point where turning a screwdriver was challenging, and that Paskewitz's emotional health

was fragile, at best.  Tr. 173.

On December 13, 2010, Paskewitz's wife wrote a letter his attorney stating that she gave

Paskewitz his medications on a daily basis because he would forget them otherwise.  Tr. 175.

She stated that she did most of the driving.  Tr. 175.  She also explained that Paskewitz's

reactions and reflexes were slow, that he required a lot of rest, and that his family would be

concerned for Paskewitz in any other work area than the special accommodations provided by

Paskewitz's employer, who is "a longtime family friend."  Tr. 175.

**D.      Administrative Hearing**

**1.      Paskewitz's Testimony**

On December 17, 2010, Paskewitz appeared with counsel and testified at a hearing before the ALJ. Tr. Tr. 459-76. He testified that he began working again after his suicide attempt in November 2009. Tr. 466-67. Paskewitz testified that he worked part-time and that, for his hours, he would work as long as he could and then go home. Tr. 466. He explained that he mainly cleaned up metal working machines and dust collectors, drilled holes and bolts parts onto machines, and put bearings on motors. Tr. 469. Paskewitz stated that he made $650 a month at the job. Tr. 467.

Paskewitz then described the condition of his right hand. He testified that his thumb is numb, so it is hard to start bolts. Tr. 467. He also stated that his little finger will not straighten and that it is hard for him to grab items because of restricted thumb movement. Tr. 467. Paskewitz testified that he had to wear splints on his fingers for three months because his fingers were bending too far back. Tr. 467-68. He also explained that he had several surgeries on his hand, including a skin graft. Tr. 468. He also stated that the electrical shock "fried" the muscles throughout his entire body, and that he now has trouble grasping things because of his decreased strength. Tr. 469-70.

Paskewitz also testified about his depression. He stated that he was taking several medications for depression, including lithium, Prozac, Respitrol, Wellbutrin, and Ambien as needed. Tr. 471. He testified that the medication improved his depression and kept away suicidal ideas. Tr. 471-72. He stated that he did not have any current side effects from his medication.

Paskewitz explained that he still drives, although not as frequently.  Tr. 472-73.  He stated that would drive to the store and to church by himself, and to work, which was 20 minutes away.  Tr. 473.  Paskewitz stated that his relationship with his children was better than it was before he attempted to commit suicide.  Tr. 473.  Paskewitz laughed several times during the hearing.  Tr. 469-72, 476.

### 2. Vocational Expert's Testimony

Evelyn Jones Sindelar appeared at the hearing and testified as a vocational expert (the "VE").  Tr. 475-80.  She stated that Paskewitz had previously worked as a sales representative (a skilled position that was performed at the light exertion level) and an electrician (semi-skilled and performed at the heavy to very heavy exertion level).  Tr. 476-77.  The ALJ then asked the VE whether a hypothetical individual with Paskewitz's vocational characteristics and the following limitations could perform any of his past relevant work:

> A person limited to light work provided there's no climbing up ladders, truss and scaffolds and only occasionally climbing otherwise.  Also only occasional fine fingering and feel sensation with the right dominant hand, and moderate limits in working with coworkers and the public, moderate limits in ability to stay on task, moderate limits in maintaining attention to simple repetitive task and working at production rate pace, and mild limits in adapting to change in routine work settings.  Let's say moderate limits in regard to doing exertion.

Tr. 477.  The VE responded that the hypothetical person could not perform any of Paskewitz's past relevant work.  Tr. 478.  The ALJ then asked the VE if the hypothetical person could perform any other work that existed in significant numbers in the national economy.  Tr. 478.  The VE answered that the hypothetical person would be able to perform other work at the light exertional level, including the following jobs:  laundry worker (720 jobs in Northeast Ohio, 28,090 jobs in Ohio, and 499,870 jobs nationally) and warehouse checker (100 jobs in Northeast Ohio, 1,600 jobs in Ohio, and 72,720 jobs nationally).  Tr. 479.

In a second hypothetical, the ALJ added the additional restrictions that gross handling is also limited to occasional and that the individual would have to recline at least an hour for work. Tr. 479. The VE responded that the additional restrictions would eliminate all work. Tr. 479.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2). In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant

work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV.  The ALJ's Decision

At Step One of the sequential analysis, the ALJ determined that Paskewitz had not engaged in substantial gainful activity since his alleged onset date of December 14, 2008.  Tr. 13. At Step Two, he found that Paskewitz had the following severe impairments: bipolar disorder, limited use of dominant right hand, cardiomyopathy, and sleep apnea.  Tr. 13.  At Step Three, the ALJ found that Paskewitz did not have an impairment or combination of impairments that met or medically equaled one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.[4]  Tr. 14. The ALJ then determined Paskewitz's RFC and found that he could perform a range of light work with the following limitations:

> [T]the claimant should never be required to climb a ladder, rope or scaffold and only occasionally be required to climb a ramp or stairs, or use his fine finger and feel sensations with his dominate right hand.  It should also be taken into consideration that the claimant has mild limitations in his ability to work with co-

---

[4]  The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

workers in interpersonal interaction and discussion and to deal with the public and adapt to changes in routine work settings.  The claimant also has moderate limitations in his ability to maintain attention to simple, repetitive tasks, to stay on task or to work at a production rate pace.

Tr. 15-16.  At Step Four, the ALJ found that Paskewitz could not perform his past relevant work.

Tr. 16.  Finally, at Step Five, after considering his vocational factors, RFC, and the evidence from the VE, the ALJ found that Paskewitz was capable of performing work that existed in significant numbers in the national economy. Tr. 17.  Thus, the ALJ concluded that Paskewitz was not disabled.  Tr. 18.

## V.  Arguments of the Parties

Paskewitz objects to the ALJ's RFC determination, arguing that it is not supported by substantial evidence.  In response, the Commissioner argues that substantial evidence supports the ALJ's RFC determination.

## VI.  Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as

14

substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.**      **Substantial Evidence Supports the ALJ's RFC Determination[5]**

Paskewitz asserts that the ALJ erred because he improperly assessed Paskewitz's RFC. Paskewitz contends that the ALJ's RFC determination is not supported by substantial evidence because he failed to consider all of the evidence in the record and failed to fully articulate the reasons for his determination.  Doc. 12, p. 10-11.  Contrary to these arguments, the ALJ reviewed all of the evidence of record and fully explained how he determined Paskewitz's RFC and Paskewitz's arguments are without merit.

A claimant's RFC is a measure of "the most [he] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545, 416.945.  The ALJ is responsible for assessing a claimant's RFC based on the relevant evidence.  20 C.F.R. §§ 404.1545, 404.1546(c).  In reaching an RFC determination, the ALJ may consider both medical and non-medical evidence. *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009).  It is not the Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387.  Thus, even if substantial evidence supports an RFC determination different than that found by the ALJ, the Court must nevertheless affirm so long as substantial evidence also supports the ALJ's position.  *See Jones*, 336 F.3d at 477.

---

[5] While Paskewitz presents some arguments in his brief that appear to challenge the ALJ determination at Step Five of the sequential analysis, the gravamen of his arguments is that substantial evidence does not support the ALJ's RFC determination.  Doc. 12, p. 8.  This Report and Recommendation therefore focuses on that issue.

1.      **The ALJ's RFC Determination is Supported by Substantial Evidence**

With regard to the impairment to Paskewitz's right hand, the ALJ imposed the following

limitations in his RFC determination: no climbing up ladders, ropes, and scaffolds, only

occasional climbing of ramps or stairs, and only occasional use of fine fingering and feel

sensations. Tr. 16. The ALJ's conclusion that Paskewitz's right hand requires no additional

limitations is supported by substantial evidence. It is undisputed that Paskewitz was unable to

use his dominant right hand for several months after his suicide attempt in December 2008.

However, the evidence shows that, from February 2009 through August 2009, Paskewitz

demonstrated increasing functional use of his right hand. For example, by February 17, 2009, he

was beginning to use his right hand to feed himself and perform some activities of daily living.

Tr. 184. On April 14, 2009, Paskewitz was able to hold some light tools in his right hand, was

able to feed himself with his right hand, often without adapted foam handles, and was able to

write for a short time. Tr. 331. A few weeks later, on May 12, 2009, Paskewitz demonstrated

functional dexterity in his right hand, as he was able to pick up coins and handle tools. Tr. 309.

He also achieved "functional composite fisting of the [right] hand to allow grasp on tools, wash

cloth, and steering wheel." Tr. 309. By June 5, 2009, Paskewitz was dressing himself, eating

with his right hand, and performing some light household activities. Tr. 282. He was discharged

from occupational therapy on that date because he had achieved all of his therapy goals. Tr. 282.

In addition, on August 13, 2009, Dr. Medalie found that Paskewitz had "good return of most

function." Tr. 401. He also noted that Paskewitz was able to flex his hand into a fist with good

grip strength and that he had full motor strength in his bilateral upper extremities. Tr. 400-02.

Paskewitz did not see Dr. Medalie again for treatment for his hand for nearly a year. Tr.

412. At the July 2010 examination, Dr. Medalie noted that Paskewitz had some deformities to

several of his fingers but that he also had good range of motion, could make a fist, and could extend all of his fingers except for his ring finger.  Tr. 412.  Three months later, on October 20, 2010, Paskewitz saw Dr. Keith, who stated that Paskewitz's "hands have recovered very well. Dr. Medalie and his team have restored the usefulness of his right hand and he is back at work" Tr. 454.  In sum, while Paskewitz was unable to use his dominant right hand for a few months after his suicide attempt, the medical evidence of record supports the ALJ's conclusion that Paskewitz's hand progressively improved, such that he had few remaining limitations by the end of the relevant time period.  The ALJ more than adequately accounted for those few limitations in his RFC determination and that determination is supported by substantial evidence.

With regard to Paskewitz's mental impairments, the ALJ imposed the following limitations in his RFC determination: mild limits in working with coworkers and the public, moderate limits in ability to stay on task, moderate limits in maintaining attention to simple repetitive tasks and working at production rate pace, and mild limits in adapting to change in routine work settings.  This determination is supported by substantial evidence.  Beginning in February 2009 and continuing throughout the relevant time period, Paskewitz generally had unremarkable mental status examinations.  Tr. 238, 271-73, 355, 357-60, 364, 374-75, 400.  He frequently denied having any suicidal ideations (Tr. 271-72, 355, 358) and, at several sessions, he denied having significant, or any, depressive, manic, mood, or anxiety symptoms.  Tr. 270, 272, 357, 359.  On February 11, 2009, two months after his suicide attempt, Paskewitz reported feeling 80% improved and denied any suicidal thoughts and his GAF score was 50.  Tr. 236, 239.  By May 19, 2009, his mental impairments were in remission, and they remained in remission through September 2009.  Tr. 271, 356, 358.  In February 2010, Paskewitz changed mental healthcare providers and was assessed a GAF score of 61-70 by his new psychiatrist, Dr.

Fajobi.  Tr. 375.  At a session with Dr. Fajobi on September 1, 2010, the last mental health treatment note in the record, Paskewitz denied any current depressive symptoms or anger outbursts or suicidal ideation and, with the exception of a blunt affect, his mental status examination was unremarkable.  Tr. 427.  Dr. Fajobi observed that Paskewitz was oriented to time, person, and place, that his thought process was logical and organized, that his attention and concentration were sustained, that his recent and remote memory were within normal limits, and that his judgment and insight were fair.  Tr. 427.

Moreover, Dr. Waddell, a state agency reviewing physician, found that Paskewitz's mental impairments did not rise to a disability level.  Tr. 242-55, 256-59.  Significantly, agency regulations provide that state agency reviewing sources are highly skilled medical professionals who are experts in social security issues.  *See* 20 C.F.R. § 416.927.  Dr. Waddell opined that Paskewitz had moderate restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  Tr. 252.  Dr. Waddell also opined that Paskewitz, despite his mental impairments, was "able to understand, remember, and complete a variety of tasks in environments [without] time or production pressure. He can engage appropriately in social interactions."  Tr. 256-59.

All of this evidence supports the ALJ's conclusion that Paskewitz had shown consistent improvement in his mental state.  This evidence also supports the limitations imposed by the ALJ with regard to Paskewitz's mental impairments.  Accordingly, substantial evidence supports the ALJ's RFC determination with regard to Paskewitz's mental impairments.

Notwithstanding the foregoing, Paskewitz argues that the ALJ erred because he failed to address or consider pertinent medical evidence in the record that supported a different, more restrictive RFC and, ultimately, a finding of disability.  For example, Paskewitz contends that the

ALJ failed to consider evidence that would establish that he had additional problems with functioning in his right hand, including limitations on grasping, twisting, and grip strength.  Doc. 12, p. 11.  Similarly, he points to evidence that he claims establishes that his mental impairments are more severe than found by the ALJ.  Doc. 12, pp. 10-11.  "Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."  *Simmons v. Barnhart*, 114 F. App'x. 727, 733 (6th Cir. 2004) (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)); *see also Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989) (Commissioner need not address every piece of evidence in the record); *Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x. 195, 199 (6th Cir. 2010) ("Neither the ALJ nor the Council is required to discuss each piece of data in its opinion, so long as they consider the evidence as a whole and reach a reasoned conclusion.") (citation omitted).   The fact that a specific piece of evidence is not discussed does not indicate that it was not considered by the ALJ.  *See Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 489 (6th Cir. 2005) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered") (quotations omitted).  Thus, the failure of the ALJ to reference certain pieces of evidence, standing alone, does not constitute reversible error.

Paskewitz essentially accuses the ALJ of cherry-picking the record in order to select evidence that portrays his condition in a positive light.  As noted by the Sixth Circuit, the so-called cherry-picking of evidence by the ALJ "can be described more neutrally as weighing the evidence."  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)

19

(citation omitted).  "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."  *Id.* at 773 (citations omitted).  In this case, the ALJ reviewed the entire record, weighed the evidence, and concluded that Paskewitz retained the ability to do light work subject to certain limitations.  Thus, even assuming that there is evidence in the record that supports Paskewitz's claim that he is more limited that found by the ALJ, it is also true that substantial evidence supports the ALJ's conclusion that Paskewitz's physical and mental impairments had improved since his attempted suicide and that he can perform a limited range of light work.  Based on the applicable standard of review set forth above, the ALJ's RFC determination should be affirmed.

### 2.  The ALJ's Credibility Determination

Paskewitz also argues that the ALJ erred because he failed to articulate whether he found Paskewitz's testimony to be credible and failed to properly explain his credibility determination. Doc. 12, p. 11.  These arguments are also without merit.  The ALJ undertook the appropriate analysis for evaluating the credibility of a claimant[6] and found that Paskewitz was not fully credible.  Tr. 15-16.  Indeed, the ALJ specifically found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  Tr. 16.

---

[6]  To evaluate the credibility of a claimant's subjective reports of pain, a two-part analysis is used.  20 C.F.R. § 416.929(a); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).  First, the ALJ must determine whether the claimant has an underlying medically determinable impairment which could reasonably be expected to produce the claimant's symptoms.  *Rogers*, 486 F.3d at 247.  Second, if such an impairment exists, then the ALJ must evaluate the intensity, persistence and limiting effects of the symptoms on the claimant's ability to work.  *Id.* The ALJ should consider the following factors in evaluating a claimant's symptoms: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) the factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *Id.; see also* 20 C.F.R. §§ 404.1529(c) and 416.929(c); Social Security Rule ("SSR") 96-7p, 1996 WL 374186, *3.

This determination is entitled to "great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997).  In reviewing an ALJ's credibility determination, a court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record." *Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 476 (6th Cir. 2003).

The ALJ provided several reasons for discounting Paskewitz's credibility, including contradictions among the medical evidence, Paskewitz's testimony, and other evidence in the record. Tr. 16.  *See Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence.").  For example, the ALJ specifically cited to medical evidence from Dr. Fajobi, which showed that there had been improvement in Paskewitz's depression and anger, as well as evidence from Dr. Medalie, which showed that the range of motion in Paskewitz's hand was good and that he was consistently meeting his rehabilitation goals. Tr. 16.  The ALJ also considered Paskewitz's testimony, including his testimony that he no longer had suicidal ideation because his medications had improved his depression. Tr. 16.  Lastly, the ALJ noted that Paskewitz drove and was working part-time. Tr. 16.  Although the ALJ could have done a better job tying together his credibility determination to his discussion of the evidence, the credibility determination is both reasonable and supported by substantial evidence.  The ALJ's credibility determination is therefore entitled to deference.  *See, e.g., Cross v. Commissioner of Social Sec.,* 373 F.Supp.2d 724, 733 (N.D. Ohio 2005) (finding that the ALJ need not analyze all seven factors identified in the regulations).

### 3.     Non-Medical Evidence

Finally, Paskewitz argues that the ALJ erred because he did not consider several pieces of non-medical evidence in reaching his RFC determination, including (1) Paskewitz's return to work, (2) two written statements submitted by lay witnesses, and (3) Paskewitz's conduct at the administrative hearing.  Doc. 12, pp. 12-13.  Each argument will be addressed in turn.

### a.     Paskewitz's Ability to Sustain Part-Time Employment

Paskewitz takes issue with the statement in the ALJ's decision that he had returned to work, arguing that the record shows he was not working as he formerly did but only part-time and earning $650 per month.  Doc. 12, p. 12.  This argument is unavailing.  In his decision, the ALJ recognized that Paskewitz was not working full-time or at his former capacity, as he referred to Paskewitz's testimony that he was working part-time.  Tr. 14-16.  Further, the ALJ did not exclusively rely on the fact that Paskewitz was working to find that he was not disabled; rather, the ALJ considered Paskewitz's ability to do some work as one piece of evidence, among other medical and non-medical evidence in the record, to support his RFC finding.  There was no error in this analysis.

### b.     Written Statements from Lay Witnesses

Paskewitz contends that the ALJ erred because he failed to consider letters submitted by two lay witnesses.  Doc. 12, p. 12.  The testimony of a lay witness "must be given 'perceptible weight' [only] where it is supported by medical evidence." *Allison v. SSA*, No. 96–3261, 1997 WL 103369, at *3 (6th Cir. 1997) (citing *Lashley v. HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) ("Perceptible weight must be given to lay testimony where ... it is fully supported by the reports of the treating physicians.").  While the testimony and statements of lay witnesses must be considered, an ALJ does not have to discuss every piece of evidence presented as long as the

record is developed fully and fairly.  *Miller v. Shalala*, 8 F.3d 611, 613 (8th Cir.1993); *cf. Higgs v. Bowen*, 880 F.2d 860, 864 (6th Cir.1988) (holding that the Appeals Council did not err by failing to "spell out" in its opinion the weight it attached to lay witness testimony where the Council's opinion stated that it "considered the entire record which was before the administrative law judge, including the testimony at the hearing").  Further, pursuant to SSR 06–03p, 2006 SSR LEXIS 5 (Aug. 9, 2006), an ALJ must "consider all relevant evidence in the case record," which includes opinion evidence from "other sources."  However, SSR 06-03p does not include "an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'"  *Chambers v. Astrue*, 835 F.Supp.2d 668, 678 (S.D. Ind. 2011).

 Paskewitz is correct in his assertion that the ALJ did not specifically address the written statements of his wife and his employer.  Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."  *Dykes ex rel. Brymer v. Barnhart*, 112 F. App'x 463, 467 (6th Cir. 2004) (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).  In this case, the ALJ stated that he carefully considered all the evidence in reaching his determination. Tr. 11, 16.  Thus, the ALJ's failure specifically to address the letters from Paskewitz's wife and employer, alone, is not reversible error.

Moreover, the ALJ did not err in failing to give perceptible weight to this evidence.  With regard to the one-page letter from Paskewitz's wife, she does not offer any specific opinions as to any work-related limitations that Paskewitz has as a result of his impairments.  In addition, the statements in her letter, i.e., that Paskewitz's reactions and reflexes are slow, that she did most of the driving, and that he needed lots of rest, merely reiterate Paskewitz's own testimony.  These

assertions were specifically addressed by the ALJ in his RFC determination (Tr. 16) and, therefore, the ALJ did not err in failing to discuss this evidence.  *See, e.g., Brewer v. Astrue,* No. 4:11–CV–00081, 2012 WL 262632 (N.D. Ohio Jan. 30, 2012) (finding that ALJ did not err by declining to address the testimony of the plaintiff's sister with greater specificity because it merely reiterated certain aspects of the plaintiff's own testimony); *see also Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996); *Clevenger v. Astrue*, No. EDCV 09–1279–CW, 2010 WL 4024768, at *3–4 (C.D. Cal. Oct.13, 2010) (the failure to address lay witness testimony was harmless because the testimony was substantially similar to the statements made by the plaintiff)

With regard to the letter submitted by Paskewitz's employer, the statements and opinions concerning Paskewitz's impairments and his work-related limitations are either contradictory to the medical evidence of record or were adequately accounted for by the ALJ's RFC determination.[7]  For instance, the statement that Paskewitz's physical dexterity is so limited that turning a screwdriver can be a challenge is contradictory to the evidence from Paskewitz's treating physician that he had good return of most function to his right hand (Tr. 401), as well as evidence from the occupational therapist that Paskewitz could handle tools.  Tr. 309.  Similarly, the employer's statement that Paskewitz's "emotional health is fragile, at best" is contradictory to evidence from treating sources that Paskewitz's mental impairments had improved.  Tr., 240-41, 271-72, 356-58, 427-28.  And, the employer's statement that Paskewitz was not assigned any tasks that were time-sensitive was accommodated by the ALJ's finding that Paskewitz had moderate limitations in his ability to work at a production-rate pace.  Tr. 15-16, 173, 175.  Thus, the ALJ did not err in failing to discuss the letter from Paskewitz's employer in his RFC determination.

---

[7] It should be noted that Paskewitz's employer was a "longtime family friend."  Tr. 175.

### c.      Paskewitz's Conduct at the Administrative Hearing

Paskewitz lastly argues that the ALJ erred because he failed to consider Paskewitz's inappropriate behavior during the administrative hearing.  Doc. 12, p. 12.  This argument is meritless.  Upon review of the transcript of the administrative hearing, Paskewitz audibly laughed several times during the hearing.  Tr. 469-72, 476.  The ALJ was present at the hearing and witnessed this behavior.  The ALJ stated that he considered all of the evidence in reaching his decision, which would include evidence of Paskewitz's behavior at the hearing.  The fact that he did not specifically address Paskewitz's behavior at the hearing does otherwise undermine his RFC determination. *See Walker*, 884 F.2d at 245 (Commissioner need not address every piece of evidence in the record).  Further, any error committed by the ALJ in failing to discuss Paskewitz's behavior at the hearing is harmless.  Even if Paskewitz's conduct at the hearing was inappropriate and supports his claim that his mental impairment are more severe than found by the ALJ, substantial evidence nonetheless supports the ALJ's RFC determination and, pursuant to the applicable standard of review, the ALJ's RFC determination must be affirmed.

### VII.  Conclusion and Recommendation

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff Herb A. Paskewitz's applications for DIB and SSI should be **AFFIRMED**.

Dated: October 29, 2012

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986)*.*